1   DAVID H. KRAMER, SBN 168452
    Email: dkramer@wsgr.com
2   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation
3   650 Page Mill Road
    Palo Alto, CA 94304-1050
4   Telephone:  (650) 493-9300

5   *Counsel for Defendant*
    *PINTEREST, INC.*

6

7                UNITED STATES DISTRICT COURT

8                NORTHERN DISTRICT OF CALIFORNIA

9                      SAN JOSE DIVISION

10

11  MAUREEN HARRINGTON, as the               )   CASE NO.:  5:20-cv-05290-EJD
    representative of the Estate of Blaine Harrington )
12  III, and HAROLD DAVIS, on behalf of      )   **DEFENDANT PINTEREST, INC.'S**
    themselves and others similarly situated, )   **NOTICE OF MOTION AND**
13                                            )   **MOTION FOR SUMMARY**
                                              )   **JUDGMENT**
              Plaintiffs,                     )
14                                            )
          v.                                  )   Date: July 17, 2025
15                                            )   Time: 9:00 a.m.
    PINTEREST, INC.,                          )   Courtroom: 4, 5th Floor
16                                            )   Judge: Hon. Edward J. Davila
              Defendant.                      )
17                                            )   Complaint Filed: July 31, 2020
                                              )
18                                            )
                                              )
19  _____ )

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ..................................................................... 1

STATEMENT OF REQUESTED RELIEF AND ISSUES TO BE DECIDED ............................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

BACKGROUND ......................................................................................................... 3

      A.     The Pinterest Service ................................................................... 3

      B.     The *Davis* Action ....................................................................... 5

      C.     Harrington's Separate But Virtually Identical Action ..................... 7

LEGAL STANDARD .................................................................................................. 8

ARGUMENT ............................................................................................................. 9

I.     The DMCA And Its Safe Harbors ................................................................. 9

II.     Pinterest Satisfies The Threshold Qualifications For DMCA Safe Harbor Protection ..... 10

III.     Harrington's Notification-Based Claim Arises "By Reason Of The Storage" By Users Of Material On Pinterest's Service ..................................................... 11

IV.     Harrington's Notification-Based Claim Arises "By Reason Of [Pinterest] Referring Or Linking Users" To Harrington's Photograph .................................... 14

V.     Plaintiff Cannot Show An Exception To The Safe Harbors Applies ..................... 17

      A.     Harrington Cannot Show That Pinterest Had Disqualifying Knowledge Of The Specific Alleged Infringement ............................... 17

      B.     Pinterest Did Not Receive A Financial Benefit Directly Attributable To The Allegedly Infringing Activity And Did Not Have The Right And Ability To Control Such Activity ...................................................... 18

CONCLUSION ......................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Affordable Aerial Photography, Inc. v. Ross,*
2023 WL 4014822 (S.D. Fla. Apr. 25, 2023) ................................................................ 12

*Alabama v. North Carolina,*
560 U.S. 330 (2010) ...................................................................................................... 16

*Capitol Recs., LLC v. Vimeo, Inc.,*
125 F.4th 409 (2d Cir. 2025) ............................................................................ 17, 18, 19

*Columbia Pictures Indus., Inc. v. Fung,*
710 F.3d 1020 (9th Cir. 2013) ....................................................................................... 19

*Corbis Corp. v. Amazon.com, Inc.,*
351 F. Supp. 2d 1090 (W.D. Wash. 2004) .................................................................... 18

*Davis v. Pinterest, Inc.,*
2023 WL 5695992 (9th Cir. Sept. 5, 2023) ........................................................... *passim*

*Davis v. Pinterest, Inc.,*
601 F. Supp. 3d 514 (N.D. Cal. 2022) .................................................................. *passim*

*eAdGear, Inc. v. Liu,*
2012 WL 2367805 (N.D. Cal. June 21, 2012) ............................................................... 12

*Elite Semiconductor, Inc. v. Anchor Semiconductor, Inc.,*
2025 WL 82217 (N.D. Cal. Jan. 13, 2025) ...................................................................... 8

*Flava Works, Inc. v. Gunter,*
689 F.3d 754 (7th Cir. 2012) ......................................................................................... 14

*Gallardo By & Through Vassallo v. Marstiller,*
596 U.S. 420 (2022) ...................................................................................................... 16

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.,*
210 F.3d 1099 (9th Cir. 2000) ......................................................................................... 8

*Patterson v. Georgia Pac., LLC,*
38 F.4th 1336 (11th Cir. 2022) ...................................................................................... 15

*Perfect 10, Inc. v. Amazon.com, Inc.,*
508 F.3d 1146 (9th Cir. 2007) ......................................................................................... 9

*Perfect 10, Inc. v. CCBill, LLC,*
340 F. Supp. 2d 1077 (C.D. Cal. 2004) ................................................................... 15, 16

*Sch. Dist. No. 1J v. ACandS, Inc.,*
5 F.3d 1255 (9th Cir. 1993) ............................................................................................. 8

*UMG Recordings, Inc. v. Shelter Cap. Partners LLC*,
    718 F.3d 1006 (9th Cir. 2013) ................................................................*passim*

*UMG Recordings, Inc. v. Veoh Networks Inc.*,
    665 F. Supp. 2d 1099 (C.D. Cal. 2009) ............................................................ 9

*Ventura Content, Ltd. v. Motherless, Inc.*,
    885 F.3d 597 (9th Cir. 2018) ...................................................................*passim*

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    676 F.3d 19 (2d Cir. 2012) ............................................................................ 13

**STATUTES**

17 U.S.C. § 512(a) ............................................................................. 9, 16

17 U.S.C. § 512(b) ............................................................................. 9, 16

17 U.S.C. § 512(c) ...............................................................................*passim*

17 U.S.C. § 512(d) ...............................................................................*passim*

17 U.S.C. § 512(i) ............................................................................ 10, 11

17 U.S.C. § 512(k) ................................................................................. 10

17 U.S.C. § 512(n) ................................................................................. 14

**RULE**

Fed. R. Civ. P. 56 ................................................................................... 8

**MISCELLANEOUS**

H.R. Rep. No. 105-551 (1998) ........................................................ 14, 15, 17

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (2024) ...................... 11

Register of Copyrights, *Section 512 of Title 17* (May 2020) ........................... 11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on July 17, 2025, at 9 a.m. in the U.S. District Court for the Northern District of California, San Jose, California, Defendant Pinterest, Inc. ("Pinterest") will move for an order entering summary judgment in Pinterest's favor.

### STATEMENT OF REQUESTED RELIEF AND ISSUES TO BE DECIDED

Pinterest requests that the Court grant summary judgment for Pinterest on Plaintiff Maureen Harrington's ("Plaintiff" or "Harrington") remaining claim of direct copyright infringement on two grounds.[1]  First, Pinterest is shielded by the Digital Millennium Copyright Act's ("DMCA") 512(c) safe harbor because any alleged infringement of Plaintiff's work arose "by reason of the storage" of the work on Pinterest's service at the direction of a user, 17 U.S.C. § 512(c)(1).  Second, Pinterest is shielded by the DMCA's 512(d) safe harbor because any alleged infringement of Plaintiff's work arose "by reason of [Pinterest] referring or linking users" to the material, *id.* § 512(d)(1).

### MEMORANDUM OF POINTS AND AUTHORITIES

Harrington, a photographer, sued Pinterest in 2020.  He claimed that Pinterest users had uploaded his photograph to the popular image sharing service without his authorization and that by operating the service, Pinterest committed a variety of copyright violations.  This Court's prior orders whittled Harrington's case down to a lone claim of direct copyright infringement.  With respect to that claim, Harrington obtained a lengthy stay to await the outcome of an earlier-filed action, *Davis v. Pinterest*, through which Harrington's counsel pursued the same infringement claim on behalf of a different photographer.  In *Davis*, Judge Gilliam granted Pinterest's motion for summary judgment, holding that the Section 512(c) safe harbor in the DMCA shielded Pinterest's online service from liability.  601 F. Supp. 3d 514 (N.D. Cal. 2022).  The Ninth Circuit affirmed Pinterest's win, holding that "Pinterest established that it is entitled to safe harbor

---

[1] The original Plaintiff (Blaine Harrington III) died in January 2021.  ECF No. 74.  His widow (Maureen Harrington) substituted in as the representative of Mr. Harrington's estate.  *See* ECF No. 77.

1  protection under [the DMCA]." *Davis v. Pinterest, Inc.*, 2023 WL 5695992, at *1 (9th Cir. Sept.

2  5, 2023).

3        *Davis* should have ended this matter.  But Harrington insisted on pursuing a slender reed

4  of a claim—that Pinterest committed direct copyright infringement by sending a single email

5  notification message that included a hyperlink to a Harrington photo on the Pinterest service.  ECF

6  No. 87 at 2; ECF No. 88 ("TAC") ¶¶ 31, 33, 61, 62.  The plaintiff in *Davis* had asserted the identical

7  claim, but had not timely put any notification message at issue.  Still, Judge Gilliam considered

8  and refuted the claim, recognizing that notification messages themselves do not infringe any

9  copyrights because they do not contain copies of works, only hyperlinks to images hosted on

10  Pinterest's service.  *Davis*, 601 F. Supp. 3d at 527.  Given that, Judge Gilliam reasoned that to the

11  extent a notification message occasioned a display of a photo by linking to the photo on Pinterest's

12  service, any claim of infringement (like any other claim arising by reason of a user's upload of a

13  photo to the service) would be barred by the Section 512(c) safe harbor.  *Id.*  As he put it, a claim

14  based on notifications ultimately "collapses into" the infringement theories against Pinterest that

15  both he and the Ninth Circuit found the DMCA foreclosed.  *Id.*

16        Because the record that had been developed in *Davis* disposed of any factual issues around

17  the notification theory, Harrington's counsel suggested that "the parties cut to the chase" and

18  obtain a ruling on the DMCA's application to notifications "without further discovery."  ECF No.

19  95-2 at 5.  Accordingly, Pinterest moved to dismiss in this action, explaining that the logic of *Davis*

20  on notifications—even if *dicta*—applies with equal force to Harrington's notification claim.  While

21  recognizing that "*Davis* certainly educates the Court's analysis," this Court invited a motion for

22  summary judgment so that it could review Harrington's claim on a "complete factual record."  ECF

23  No. 100 at 7.  That record leaves no doubt that Harrington's claim fails.

24        Judge Gilliam was exactly correct—notifications do not display images outside of or

25  independent from Pinterest's service.  Rather, the notifications simply link to images stored on

26  Pinterest's service.  If a user opens a Pinterest notification message containing such a link and the

27  user's email program is set to display images, the email program requests a copy of the image from

28  Pinterest's service in the same way that a user requests the image by visiting Pinterest's service

using a web browser.  Given that, Harrington's claim that Pinterest improperly displays the image in response to such a request is doubly-barred by the DMCA.

First, the DMCA's Section 512(c) safe harbor "limits service providers' liability for infringement 'by reason of the storage at the direction of a user'" of material on the provider's service.  *Davis*, 2023 WL 5695992, at *1.  Harrington's claim of an infringing display of his photo triggered by a notification message undisputedly arises by reason of a user's storage of that photo on Pinterest's service.  The analysis need go no further.  By its plain terms, the Section 512(c) safe harbor shields Pinterest from liability, just as it did in *Davis*.

Second, the DMCA's Section 512(d) safe harbor precludes Harrington's claim.  That safe harbor immunizes Pinterest against claims of infringement that arise "by reason of the provider referring or linking users to an online location containing infringing material … by using information location tools, including a directory, index, reference, pointer, or hypertext link."  17 U.S.C. § 512(d).  The allegedly infringing display of Harrington's photo at issue here undeniably arises "by reason of [Pinterest's] referring or linking users" to that photograph through a notification message.  If Pinterest had not linked to the photo, no infringement claim could possibly lie.  Again, that should be the end of the analysis.  Harrington's claim against Pinterest fails as a matter of law.

## BACKGROUND

### A.    The Pinterest Service

Pinterest is a popular online service that allows its users to upload or save images of their choosing to the service and share them with a worldwide audience.  Declaration of David H. Kramer in Support of Pinterest's Motion for Summary Judgment ("Kramer Decl.") Ex. K ("DeChant Decl. I") ¶¶ 2-3.  An individual image, together with a user-selected title, description, and hyperlink to a third-party destination webpage comprises a "Pin."  *Id.* ¶¶ 4-7.  Today, Pinterest

1    hosts billions of user-created Pins that it makes accessible to hundreds of millions of users. *See*

2    *id.* ¶ 7; Kramer Decl. Ex. J ("Lien Decl.") ¶ 19.[2]

3          Users post Pins on personal, virtual bulletin boards that other users can visit to find content

4    of interest. DeChant Decl. I ¶ 7. Users can also search for content through Pinterest's search

5    functionality or by accessing "feeds"—grids of fractionally sized Pins that Pinterest

6    algorithmically generates and personalizes for users based on their demonstrated interests.[3] *Id.* ¶¶

7    12-16 & Exs. 1-4.

8          Pinterest also allows users to receive notifications alerting them to content on the service

9    that may be of interest to them. DeChant Decl. I ¶ 18. Like feeds, notifications use machine-

10   learning algorithms to automatically surface user-uploaded content based on the recipient user's

11   past activity on the service. *Id.* Users control whether to receive notifications, and whether to do

12   so via email or through the Pinterest mobile application. Kramer Decl. Ex. A (Deposition of K.

13   Kim) at 48:10-49:17; *see also* DeChant Decl. I ¶ 18. Importantly, for purposes of Harrington's

14   remaining claim, notifications do not themselves contain copies of images. They contain only

15   ───────────────

16       [2] Pinterest has been praised as a "powerful" tool for photographers to "grow brand awareness"

17   and "drive traffic to [their] site[s]." Kramer Decl. Ex. P; *see also id.* Exs. Q ("Pinterest is this

18   huge, visual search engine that can help you get in front of a bigger audience, bringing more traffic

19   and leads to your website."); R ("Pinterest is the number one source of web traffic for my site, so

20   I honestly can't sing its praises enough."). And its success is due in no small measure to its

21   industry-leading efforts on behalf of copyright holders. Not only does Pinterest staff a group to

22   respond immediately and around-the-clock to notices of alleged infringement, but it also developed

23   a Content Claiming Portal to give rightsholders the ability to automatically control if, and how,

24   their content appears on Pinterest. Lien Decl. ¶¶ 22-23.

25       [3] Each of the Pinterest functionalities relies on machine-learning algorithms that respond to a

26   variety of user inputs to recommend content of interest to a given user. DeChant Decl. I ¶ 12.

27   Pinterest's machine-learning algorithms function automatically, are keyed to user activity, and do

28   not involve human review or curation of content. *Id.* ¶¶ 12-16.

hyperlinks—i.e., HyperText Markup Language (HTML) links—that point back to images hosted on Pinterest's service.  Kramer Decl. Ex. A (K. Kim 30(b)(6) Deposition) at 42:3–43:24; *Davis*, 601 F. Supp. 3d at 527.  For a notification message to result in the display of an image that a user stored on Pinterest, a user must first open the message.  Then, if the user's email program or Pinterest application is set to display images, the software will call to Pinterest's servers to request the image that is linked to in the notification message.  Kramer Decl. Ex. D, Response to Interr. No. 8; *id.* Ex. A (K. Kim 30(b)(6) Deposition) at 42:3–43:24; *Davis*, 601 F. Supp. 3d at 527.  This operation is functionally no different than the process that occurs when a user's web browser requests, receives, and displays an image hosted on Pinterest's website. Declaration of Nick DeChant in Support of Pinterest's Motion for Summary Judgment, dated March 31, 2025 ("DeChant Decl. II") ¶ 6.  In both cases, the user's software sends a request to Pinterest's computer system on which users have stored the image, and the system automatically responds by sending the requested image for display on the user's computer.  *Id.*  In neither instance does the display occur independent from the service.  *Id.*

## B. The *Davis* Action

Over five years ago, Harold Davis sued Pinterest in this District asserting claims that Pinterest infringed his copyrighted photographs.  *See Davis*, ECF No. 1.  Represented by the same counsel who represents Harrington, Davis alleged, *inter alia,* that users had uploaded his photos to Pinterest without authorization and Pinterest infringed the photos by copying, distributing, and displaying those photos to users in the ordinary operation of the service.  *See id.*, Am. Compl., ECF No. 23 ¶ 326 (alleging Pinterest "distributed Copyrighted Photographs to third party users of Pinterest"); *id.*, Second Am. Compl., ECF No. 56 ¶ 6 (alleging Pinterest infringed by "by displaying and distributing" user-uploaded images through its service).  Among the ways Davis claimed Pinterest infringed was through its suggestion to users of content of interest through notification messages.  *Id.*, Am. Compl., ECF No. 23 ¶¶ 153-84.

The parties conducted extensive discovery focused on whether Davis' infringement claims were barred by the DMCA's safe harbor in Section 512(c), which shields online services from infringement claims arising from material uploaded to those services by users.  *See* 17 U.S.C. §

512(c).  Davis thoroughly examined the operation of Pinterest's service, and specifically investigated the notification process, deposing Pinterest's project manager for the functionality and serving targeted document requests.  *See Davis*, ECF Nos. 98-1, 160-5; Kramer Decl. ¶ 4.  At the Court-ordered deadline to identify his complete set of alleged infringements, Davis charged that Pinterest infringed dozens of his photos by copying and displaying them to users in various contexts.  Davis did not, however, identify any alleged infringements of his work supposedly caused by Pinterest notifications.  *See Davis*, 601 F. Supp. 3d at 527.

Thereafter, the parties cross-moved for summary judgment.  With respect to the infringement claims Davis actually identified, Pinterest showed that it satisfied all of the threshold requirements for protection under the 512(c) safe harbor.  *See* 17 U.S.C. §§ 512(c), (i).  Davis did not even attempt to dispute Pinterest's showing.  *Davis*, 601 F. Supp. 3d at 528.  Instead, Davis argued that 512(c) was inapplicable because (1) Pinterest's copying and display of his photos did not arise by reason of users' storage of those photos on the Pinterest service; and (2) Pinterest had the right and ability to control the alleged infringements and earned a direct financial benefit from them.  *See* 17 U.S.C. § 512(c).  Judge Gilliam soundly rejected both arguments and held that Pinterest was shielded by the 512(c) safe harbor.  *Davis*, 601 F. Supp. 3d at 528-36.  Central to his ruling on both points was the fact that Pinterest's users—rather than Pinterest itself—decide which images are uploaded to Pinterest's service.  Davis' infringement claims all arose "'by reason of storage at the direction of a user'" because "users upload[ed]" his images, and Pinterest's actions to "enhance users' access to these images" did not change the analysis.  *See id.* at 533-34 (quoting 17 U.S.C. § 512(c)(1)).  Similarly, Pinterest's "use of algorithms" to display content and "advertisement[s] on the platform" did not mean Pinterest had "control over … users' infringing activity," given that "[u]sers upload content, and Pinterest does not direct them to upload any specific content."  *Id.* at 534-35 (citing DeChant Decl. I ¶¶ 2-4).

Davis tried to add infringement claims based on notification messages during the summary judgment briefing.  Judge Gilliam shut that effort down.  *Id.* at 527.  He then went on to explain that even if notifications were properly at issue, infringement claims based on them were equally barred by Section 512(c).  As he recognized, Pinterest's notifications do not, in-and-of themselves,

infringe any copyrights because they contain only "*hyperlinks* to images on Pinterest's website and mobile application."  *Id.* (emphasis in original).  And while notifications may, through those hyperlinks, result in the display of an image stored on Pinterest's service, that display arises by reason of a user's storage of that image on Pinterest in the first place.  *See id.*  Thus, Judge Gilliam concluded that Davis' notification-based theory "collapses into" his arguments about Pinterest's copying and display of images generally—and would be barred by Section 512(c) for the same reasons.  *Id.*

Davis appealed, and the Ninth Circuit affirmed in full.  *Davis*, 2023 WL 5695992, at *2.

### C.    Harrington's Separate But Virtually Identical Action

Before his death in January 2023, Harrington was a prolific copyright litigant.  *See* ECF No. 51 at 3 n.2.  He and Davis coordinated their lawsuits against Pinterest from the start.  Indeed, Davis initially tried to pursue his case as a class action through a proposed complaint that mentioned Harrington by name.  *Davis*, ECF No. 41-1 ¶¶ 7, 76-81.  After Judge Gilliam instructed their common counsel that he could not see how a class could ever be certified, Harrington decided to pursue this action in a different court.  His complaint lifted entire passages verbatim from Davis' pleading and proposed the same class that Judge Gilliam viewed skeptically.[4]  ECF No. 1.  Harrington then agreed to stay his copycat case to await rulings in *Davis*.  ECF Nos. 66, 71.

After the Ninth Circuit affirmed Pinterest's entitlement to the Section 512(c) safe harbor in *Davis*, Harrington insisted he could still pursue the notifications-based theory of infringement that Judge Gilliam had analyzed.  *See* ECF No. 82.  Harrington proffered a single Pinterest notification message that he himself had received in July 2020, claiming that it occasioned an infringing display of a user-uploaded photograph titled "Waikiki Beach, Honolulu, Oahu, Hawaii, USA."  *See* TAC ¶¶ 31-33; *Davis*, 2023 WL 5695992, at *1 ("Pinterest's content is uploaded

---

[4] Harrington also pursued claims in this case for contributory infringement and improper removal of copyright management information ("CMI").  *See* ECF No. 1.  This Court dismissed both claims in detailed Orders. ECF No. 39 at 5-12 (dismissing contributory infringement claim); ECF No. 73 (dismissing CMI claim).

1   entirely at the volition of the user, and Pinterest does not exercise judgment in what to host.");

2   DeChant Decl. I ¶¶ 2, 7 (users, not Pinterest, upload photos to the service and select the content to

3   upload themselves); DeChant Decl. II ¶ 2; Kramer Decl. Ex. C (N. DeChant Deposition) at 31:1-

4   17 (Pinterest users upload the images available on the Pinterest service).[5]

5       Acknowledging that the parties had developed a detailed record on the infringement via

6   notifications theory in *Davis*, Harrington's counsel suggested that "the parties cut to the chase and

7   obtain a ruling on whether the DMCA shields Pinterest's notifications, either on Pinterest's motion

8   to dismiss or on summary judgment, without further discovery."  ECF No. 95-2 at 5.  In response

9   to Pinterest's motion to dismiss, this Court concluded that "[w]hile *Davis* certainly educates the

10   Court's analysis, it does not end it at this stage."  ECF No. 100 at 7.  It thus directed Pinterest to

11   present the issue via an early summary judgment motion.  ECF No. 105 at 1.

12                  **LEGAL STANDARD**

13       "The court shall grant summary judgment if the movant shows that there is no genuine

14   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.  R.

15   Civ. P. 56(a).  "Summary judgment is not precluded simply because there is a dispute of some

16   facts in a case.  To defeat a motion for summary judgment, the nonmoving party must present facts

17   in support of the issues on which it would bear the burden of proof at trial, there must be probative

18   evidence of those facts, and the facts must be uncontroverted or at least create a genuine issue of

19   material fact."  *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir. 1993).  Accordingly,

20   a defendant may prevail by "'either produc[ing] evidence negating an essential element of [the

21   nonmoving party's] claim or defense or show that [the nonmoving party] does not have enough

22   evidence of an essential element to carry its ultimate burden of persuasion at trial.'"  *Elite*

23

---

24      [5]  Harrington signed up for Pinterest and requested to receive notification messages.  Pinterest

25   sent him one at the email address he supplied, containing a link to one of his photos on the service.

26   *See* DeChant Decl. II ¶ 7; TAC ¶ 31 (showing the notification email at issue was sent to

27   blaineharr@comcast.net on July 29, 2020).  Rather than requesting Pinterest remove the image,

28   Harrington sued two days later.  Compl., ECF No. 1 ¶ 47 (filed July 31, 2020).

*Semiconductor, Inc. v. Anchor Semiconductor, Inc.*, 2025 WL 82217, at *2 (N.D. Cal. Jan. 13, 2025) (Davila, J.) (quoting *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000)).  Pinterest may also prevail by establishing the absence of genuine disputes as to the applicability of a defense such as the DMCA safe harbors.  *See UMG Recordings, Inc. v. Veoh Networks Inc.*, 665 F. Supp. 2d 1099, 1118 (C.D. Cal. 2009); *accord Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 619 (9th Cir. 2018).

## ARGUMENT

### I.    The DMCA And Its Safe Harbors

In enacting the DMCA, Congress recognized that in "the ordinary course of their operations[,] service providers must engage in all kinds of acts that expose them to potential copyright infringement liability."  *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (quoting S. Rep. 105-190, at 8 (May 11, 1998)); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007).  While it was aware that online services "are capable of being misused to facilitate copyright infringement, it was loath to permit the specter of liability to chill innovation that could also serve substantial socially beneficial functions. Congress decided that 'by limiting service providers' liability,' it would 'ensure that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand.'"  *Shelter Cap.*, 718 F.3d at 1014 (quoting S. Rep. 105-190, at 8).  Congress thus established four DMCA safe harbors that shield online services from copyright infringement claims arising from their typical operations.  *Id.*; *see* 17 U.S.C. §§ 512(a)-(d).

To invoke safe harbor protection, a service provider like Pinterest must demonstrate that it satisfies certain threshold statutory requirements, and then that the claim arises from an activity that one or more of the safe harbors covers.  The burden then shifts to the plaintiff to demonstrate why some exclusion from the safe harbors applies.

Here, Pinterest easily satisfies the threshold requirements, and Harrington's claim based on notifications falls squarely within the ambit of two different safe harbors.  The first, 17 U.S.C. § 512(c), was discussed at length in *Davis*, and protects a service provider from liability for infringement claims that arise "by reason of the storage at the direction of a user of material that

1    resides on a system or network controlled or operated by or for the service provider." 17 U.S.C.

2    § 512(c)(1).  The second, 17 U.S.C. § 512(d), protects a service provider from liability for

3    infringement claims arising "by reason of the provider referring or linking users to an online

4    location containing infringing material or infringing activity, by using information location tools,

5    including a directory, index, reference, pointer, or hypertext link." 17 U.S.C. § 512(d).  Harrington

6    cannot demonstrate that any exclusion from the safe harbors applies.  Accordingly, the safe harbors

7    bar his claim.

8    **II.      Pinterest Satisfies The Threshold Qualifications For DMCA Safe Harbor Protection.**

9              There are four threshold statutory requirements for a party to qualify for protection under

10   the DMCA's 512(c) and 512(d) safe harbors.  The party must (1) be a "service provider," 17 U.S.C.

11   §§ 512(c)(1), 512(d)(1); (2) have registered and posted contact information for a designated agent

12   to receive DMCA takedown notices, *id.* § 512(c)(2); (3) have adopted, communicated, and

13   reasonably implemented a repeat infringer policy, *id.* § 512(i)(1)(A); and (4) not interfere with

14   standard technical measures, *id.* § 512(i)(1)(B).  Harrington's counsel did not contest any of these

15   prerequisites in *Davis*, *see* 601 F. Supp. 3d at 528; 2023 WL 5695992, at *1, and Pinterest

16   indisputably satisfies all four.

17             ***Service provider.***   Pinterest is a "service provider," a term expansively defined as "a

18   provider of online services or network access."  17 U.S.C. § 512(k)(1)(B).  Pinterest operates an

19   online service that enables users to share content, including photographs.  DeChant Decl. I ¶¶ 2-3.

20   It easily qualifies as a "service provider."  *E.g.*, *Shelter Cap.*, 718 F.3d at 1016 (video-sharing

21   service is a service provider).

22             ***Designated agent.***   At all times relevant to this case, Pinterest has had a formally registered

23   designated agent with the United States Copyright Office "to receive notifications of claimed

24   infringement" as required by 17 U.S.C. § 512(c)(2).  Lien Decl. ¶ 10; Kramer Decl. Ex. B (H. Lien

25   30(b)(6) Deposition) at 58:17-59:2; Kramer Decl. Exs. E-I.  And Pinterest has always posted

26   contact information for its DMCA agent on its website.  Lien Decl. ¶ 10 & Ex. 4.

27             ***Repeat infringer policy.***   Pinterest has adopted, communicated, and implemented a robust

28   repeat infringer policy, as required by 17 U.S.C. § 512(i)(1)(A).  It assigns a strike to a user who

uploaded content that is the subject of a valid DMCA notice. *Id.* ¶¶ 16-19 & Ex. 6; Kramer Decl. Ex. B (H. Lien 30(b)(6) Deposition) at 40:22-42:2. Users who accumulate strikes face escalating consequences, up to permanent account termination. Lien Decl. ¶ 16 & Ex. 6; Kramer Decl. Ex. B (H. Lien 30(b)(6) I Deposition) at 42:3-44:5. Pinterest informs users that it will "disable or terminate the accounts" of users who "repeatedly infringe or are repeatedly charged" with infringement. Lien Decl. ¶ 18 & Ex. 4. And Pinterest keeps its word; it routinely terminates users who accumulate the requisite number of strikes. *See id.* ¶ 19.

  ***Standard technical measures.*** Pinterest also satisfies the final threshold requirement—that it "accommodate[] and does not interfere with standard technical measures." 17 U.S.C. § 512(i)(1)(B) & (i)(2). That is principally because, as of yet, there are no "standard technical measures." *See* Lien Decl. ¶ 21; Register of Copyrights, *Section 512 of Title 17* (May 2020), at 67 ("[M]ore than twenty years after passage of the DMCA, … not a single technology has been designated a 'standard technical measure' under section 512(i)."); Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 12B.02 (2024) ("[N]o published judicial decision has recognized the existence of qualifying standard technical measures."). But as noted, Pinterest has gone far beyond what the DMCA requires to develop technology giving copyright holders control over whether and where their works appear on Pinterest. *See supra n.* 2.

  Based on indisputable evidence, Pinterest meets the threshold requirements for the protections of the DMCA safe harbors.

**III. Harrington's Notification-Based Claim Arises "By Reason Of The Storage" By Users Of Material On Pinterest's Service.**

  By its terms, Section 512(c)'s safe harbor immunizes an online service against any claim of copyright infringement that arises "by reason of the storage at the direction of a user of material that resides on" the service provider's system. 17 U.S.C. § 512(c)(1). The Ninth Circuit has explained the broad scope of that protection, making clear that it is not limited to services that simply store user-uploaded material, but extends to Pinterest and other services that "facilitate access" to user-uploaded content. *Davis*, 2023 WL 5695992, at *1; *Shelter Cap.*, 718 F.3d at 1016, 1018 (service provider protected by Section 512(c) where it "store[d] user-submitted materials in

1    order to make those materials accessible to other Internet users").  Harrington's notifications-based

2    infringement claim readily falls within the scope of the 512(c) safe harbor.

3          On this score, Judge Gilliam has already weighed in.  He started by explaining that

4    notification emails do not contain copies of images from the Pinterest service.  601 F. Supp. 3d at

5    527.  Rather, notifications merely "contain *hyperlinks* to images on Pinterest's website and mobile

6    application."  *Id.*; *see* TAC ¶ 24 (Harrington acknowledging that "Notifications incorporate

7    hyperlinks to 'pinned' images that link back to Pinterest's own websites…."); Kramer Decl. Ex.

8    D, Response to Interr. No. 8 ("notifications do not contain copies of particular images.").  Next,

9    Judge Gilliam cited precedents making clear that "hyperlinking alone does not constitute copyright

10   infringement, since it does not involve any actual copying."  *Davis*, 601 F. Supp. 3d at 527;

11   *eAdGear, Inc. v. Liu*, 2012 WL 2367805, at *12 (N.D. Cal. June 21, 2012) (collecting cases holding

12   that hyperlinking is not infringement); *Affordable Aerial Photography, Inc. v. Ross*, 2023 WL

13   4014822, at *6-7 (S.D. Fla. Apr. 25, 2023) (same).  At most, when a user opens a message like a

14   Pinterest notification that contains links to images, the user's software may request (just as a web

15   browser would) that the computer system storing a linked-to image automatically supply the image

16   for display on the user's computer.  Kramer Decl. Ex. D, Response to Interr. No. 8.  And if the

17   display of the image is unauthorized, it could theoretically be a copyright infringement.  But

18   because Pinterest's notification messages link back to images on Pinterest's service, Judge Gilliam

19   recognized that any allegedly infringing display they occasioned would arise by reason of a user's

20   storage of the linked-to image on Pinterest in the first place.  *Davis*, 601 F. Supp. 3d at 527; *see*

21   *also* Kramer Decl. Ex. A (K. Kim 30(b)(6) Deposition) at 40:2-42:12; DeChant Decl. I ¶¶ 2-4;

22   Kramer Decl. Ex. B (H. Lien 30(b)(6) Deposition) at 74:20-75:2.  As Judge Gilliam deftly put it,

23   Davis' claim that notifications infringe because they link back to a copy of his photos on Pinterest's

24   service "collapse[d] into" his arguments about Pinterest's services overall, and would be barred by

25   the 512(c) safe harbor.  *Davis*, 601 F. Supp. 3d at 527.

26         The analysis for Harrington is identical.  Assuming, as Harrington alleges, that the

27   notification email sent to his email address triggered an infringing display of his photograph, that

28   infringement arose by reason of a user's storage of the photograph on Pinterest's service.  Just as

Section 512(c) barred Davis' claims that Pinterest infringed photos that users uploaded to the service by displaying them to users via their web browsers, so too does it bar Harrington's claim that Pinterest's notification message led to an infringing display of a copy of his photo that a user uploaded to Pinterest.

Davis argued that his claim did not arise from a user's storage of allegedly infringing images on Pinterest, but rather from Pinterest's recommendation and display of particular images in "feeds" that Pinterest algorithmically generates for users. As both Judge Gilliam and the Ninth Circuit held, in making such suggestions and pointing users to particular photos, Pinterest merely facilitates user access to images stored on its service by users. Any alleged infringement that results still arises by reason of the storage at the direction of users of material to Pinterest in the first place, and thus remains within the protections of the 512(c) safe harbor. *Davis*, 2023 WL 5695992, at *1 (Pinterest's selection, copying, and display of images to users to suggest what they might be interested in merely "facilitated access" to user-uploaded content and thus was within the 512(c) safe harbor); *see also Motherless*, 885 F.3d at 606 (highlighting "Most Popular" user-uploaded videos to suggest to users what to watch is facilitating access and protected by 512(c)); *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 40 (2d Cir. 2012) (featuring content helps "users locate and gain access to material stored at the direction of other users" and is within 512(c) safe harbor; *Shelter Cap.*, 718 F.3d at 1018 (online services "store user-submitted materials *in order to make those materials accessible*" and holding that Section 512(c) protects "access-facilitating processes").

Pinterest's notification messages are no different. Like feeds, notifications are simply a means by which Pinterest facilitates user access to materials stored on Pinterest's service at the direction of users. DeChant Decl. I ¶¶ 2, 12, 18. Whether through feeds or notifications, users are directly accessing materials stored on the Pinterest system by users, and the purported act of infringement arises from the user viewing an image stored on Pinterest's servers at the direction of another user. Harrington claims to have received a notification that linked to an unauthorized copy of his photo on Pinterest and that message triggered an allegedly infringing display of the photo from the service on his computer. That allegedly infringing display on Harrington's

computer of a photo stored on the Pinterest service is indistinguishable from the allegedly infringing display on Davis' computer of photos stored on the Pinterest service.  In both cases, the display results from a request by their software to Pinterest's computer system for a copy of a photo stored there by a user.  *See* Kramer Decl. Ex. D, Response to Interr. No. 8; DeChant Decl. I ¶ 18; Dechant Decl. II ¶ 6.  If those displays actually infringe the photos, the infringement arises "by reason of the storage at the direction of a user" of the photos on Pinterest's system in the first instance.  17 U.S.C. § 512(c)(1).  Accordingly, like Davis' infringement claims, Harrington's falls within the Section 512(c) safe harbor.

## IV.   Harrington's Notification-Based Claim Arises "By Reason Of [Pinterest] Referring Or Linking Users" To Harrington's Photograph.

Because the Section 512(c) safe harbor applies, the Court need not reach whether another safe harbor—Section 512(d)—bars Harrington's claim.  In drafting the DMCA, Congress recognized that the safe harbors could overlap and a service provider may claim the protections of more than one in response to a given claim.  *See* 17 U.S.C. § 512(n) ("Whether a service provider qualifies for the limitation on liability in any one of those subsections shall be based solely on the criteria in that subsection, and shall not affect a determination of whether that service provider qualifies for the limitations on liability under any other such subsection.").  That recognition is borne out in this case.

Harrington's infringement claim also is within the ambit of Section 512(d)'s safe harbor because any claim of infringement based on Pinterest's notifications arises "by reason of" Pinterest "linking users to an online location containing [allegedly] infringing material … by using information location tools, including a directory, index, reference, pointer, or hypertext link."  17 U.S.C. § 512(d).  Recognizing that information location tools are "essential to the operation of the Internet," Congress "intended [the safe harbor] to promote the development of information location tools generally."  H.R. Rep. No. 105-551, at 58 (1998).  "Congress wanted to make the safe harbor as capacious as possible," *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 758 (7th Cir. 2012), and therefore gave the 512(d) safe harbor a broad sweep, protecting not only "a directory or index of on-line sites or material, such as a search engine that identifies pages by specified

1  criteria," but also *any* "reference to other on-line material, such as a list of recommended sites; a

2  pointer that stands for an Internet location or address; and a hypertext link which allows users to

3  access material without entering its address." H.R. Rep. No. 105-551 at 56-57.

4      The hyperlinks in Pinterest's notification messages are textbook examples of information

5  location tools. They are "link[s] which allow[] users to access material without entering its

6  address." *Id.*; *see* DeChant Decl. I ¶ 18 (notifications link to "content on the service"); Kramer

7  Decl. Ex. A (K. Kim 30(b)(6) Deposition) at 40:2-41:23 (describing links in notifications). Again,

8  the purpose of those links, as with other information location tools, is to "enhance the accessibility

9  of content … by alerting the recipient to the existence of [material] … identified as being of

10  potential interest to the recipient." DeChant Decl. I ¶ 18.

11      It may well be that a link in a notification message points or directs users to an allegedly

12  infringing copy of a photograph on Pinterest's service, thereby generating an allegedly infringing

13  display of that photo. That is what Harrington contends happened here—the Pinterest notification

14  message he received contained a hyperlink to an allegedly unauthorized copy of his photo on

15  Pinterest's service, resulting in an infringing display of that photo on his computer. TAC ¶¶ 31,

16  33. Per Harrington's allegations then, any infringement arose "by reason of Pinterest referring or

17  linking users to an online location" containing the allegedly infringing material. His claim thus

18  falls comfortably within the 512(d) safe harbor. *Id.* ¶ 36.

19      Harrington suggests in his complaint that Section 512(d) does not apply when, as here, a

20  service provider links to its "own website," *id.* ¶ 31, but that is an invented-for-litigation position

21  and it is meritless. By its plain text, Section 512(d) applies to linking to "an online location," 17

22  U.S.C. § 512(d), which Pinterest's website plainly is. "[A]s is usually the case, the indefinite

23  article 'an' means 'any.'" *Patterson v. Georgia Pac., LLC*, 38 F.4th 1336, 1349 (11th Cir. 2022).

24  The text of 512(d) draws no distinction between links to a location on the service provider's own

25  website and links to a location controlled by third parties. *See, e.g.*, *Perfect 10, Inc. v. CCBill,*

26  *LLC*, 340 F. Supp. 2d 1077, 1098 (C.D. Cal. 2004) (applying Section 512(d) to bar claims against

27  service provider operating directory that linked to affiliated sites), *aff'd in part, rev'd in part on*

28  *other grounds and remanded*, 488 F.3d 1102 (9th Cir. 2007).

*Perfect 10* is instructive.  There, the service provider "provid[ed] links" and "act[ed] as a search engine" for a limited set of affiliated websites hosting allegedly infringing content. 340 F. Supp. 2d at 1083.  In ruling that the Section 512(d) safe harbor shielded the service provider for its links, the court rejected the argument that 512(d) applied only to providers "like Yahoo! or Google which provide links to millions of websites with whom [they] ha[ve] no relationship." *Id.* at 1097.  Any service that "provide[s] th[e] function" of "linking users to an online location … by using information tools," the court concluded, would be eligible for the safe harbor.  *Id.*; *see also id.* at 1098 ("Nor does § 512(d) state that the use of an information location tool is limited to internet service providers that do not have contractual relationships with [the linked-to websites].").  The limitation Harrington seeks to impose on the scope of 512(d) finds no support in the statutory text, and courts should not "add provisions" that statutes do not contain.  *See Alabama v. North Carolina*, 560 U.S. 330, 352 (2010) ("We do not—we cannot—add provisions to a federal statute.").

Statutory context further confirms the plain text reading that 512(d) applies to linking regardless of where the allegedly infringing material is stored.  Within the DMCA safe harbors, when Congress sought to distinguish a service provider's own actions or content from that of others, it did so expressly.  For example, Section 512(b)'s safe harbor for system caching applies only where "the material is made available online by a person *other than the service provider*."  17 U.S.C. § 512(b)(1)(A) (emphasis added).  Congress drew a similar distinction in the Section 512(a) safe harbor for transitory communications which applies to transmissions "initiated by or at the direction of a person *other than the service provider*."  *Id.* § 512(a)(1) (emphasis added).  But Congress did not include any such distinction in 512(d), between links to a provider's own site and links to others.  Courts "must give effect to, not nullify, Congress' choice to include limiting language in some provisions but not others."  *See Gallardo By & Through Vassallo v. Marstiller*, 596 U.S. 420, 422 (2022).

Finally, shielding information location tools that link to the service provider's own "online location[s]" makes good sense in light of Congress's stated purposes.  As noted, through Section 512(d), Congress sought to "promote the development of information location tools generally," as

1    they are "essential" to making information accessible and the Internet useful.  H.R. Rep. No. 105-

2    551, at 58 (1998).  Information location tools are just as useful and essential to navigating large

3    websites as they are to navigating the Internet as a whole.

4        There is no basis in the text of 512(d) or the policy underlying it for the distinction

5    Harrington seeks to draw.  His claim arises by reason of Pinterest linking to an online location

6    containing an allegedly infringing copy of Harrington's photo.  The claim is thus covered by the

7    512(d) safe harbor.

8    **V.    Plaintiff Cannot Show An Exception To The Safe Harbors Applies.**

9        As demonstrated above, Pinterest easily satisfies the threshold qualifications for safe

10   harbor protection and Harrington's notifications-based claim falls within two separate DMCA safe

11   harbors.  Given Pinterest's showing, the safe harbors foreclose Harrington's claim unless he can

12   show: (1) that Pinterest knew of the specific instance of infringement at issue in the case, but failed

13   to act "expeditiously" to remove or disable access to it; or (2) that Pinterest both had the "right and

14   ability to control" the infringing activity alleged and received "a financial benefit directly

15   attributable" to that activity.  17 U.S.C. § 512(c)(1)(A); *id.* §§ 512(d)(1)-(3).  Harrington, as the

16   plaintiff, has the burden of showing these disqualifying circumstances.  *Motherless*, 885 F.3d at

17   610 ("The copyright owner must show knowledge…."); *Capitol Recs., LLC v. Vimeo, Inc.*, 125

18   F.4th 409, 419 (2d Cir. 2025) ("a plaintiff must also … show[] that the defendant … received a

19   financial benefit directly attributable to the infringing activity while having the right and ability to

20   control such activity").  He cannot possibly establish them here.

21       **A.    Harrington Cannot Show That Pinterest Had Disqualifying Knowledge Of The**

22            **Specific Alleged Infringement.**

23       Harrington cannot demonstrate that Pinterest had knowledge of the allegedly infringing

24   photo on its service and failed to act "expeditiously to remove, or disable access to [it]."  *See* 17

25   U.S.C. § 512(c)(1)(C)); *Shelter Cap.*, 718 F.3d at 1021.  In *Davis*, Pinterest's lack of relevant

26   knowledge was conceded, as it should be here.  *See* 601 F. Supp. 3d at 528; *Davis*, 2023 WL

27   5695992, at *1.  Harrington admits that he "did not submit any Takedown Notices to Pinterest."

28   Kramer Decl. Ex. M, Response to Interr. 10; *accord id.* Ex. N, Response to RFP 10 ("Plaintiff has

1    no notice [of alleged copyright infringement] documents within his possession, custody, or control

2    related to the Works in Suit that were sent to Pinterest."); *id.* Ex. N, Response to RFP 9 (stating

3    Plaintiff "never sent communications to Pinterest").  That is, he did not follow the DMCA's

4    prescribed method by which a copyright holder can alert a service provider to specific, allegedly

5    infringing content on its service.  *Shelter Cap.*, 718 F.3d at 1020 (plaintiff's "decision to forgo the

6    DMCA notice protocol 'stripped [him] of the most powerful evidence of a service provider's

7    knowledge—actual notice of infringement from the copyright holder'" (quoting *Corbis Corp. v.*

8    *Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1107 (W.D. Wash. 2004)).  Nor is there any evidence to

9    suggest Pinterest otherwise knew of the allegedly infringing photo on its service or that it actually

10   knew of facts from which the alleged infringement was apparent.  *Motherless*, 885 F.3d at 609;

11   *see also* 17 U.S.C. §§ 512(c)(1)(A)(i)-(iii).

12       The absence of the required knowledge is no surprise.  Because Pinterest hosts "billions"

13   of pieces of content, it "does not" and "could not[] manually review the content that users choose

14   to store on its computer network." DeChant Decl. I ¶ 7.  And even if Pinterest somehow discovered

15   one of Harrington's photos on the service, it would not know whether it was uploaded by

16   Harrington or with his authorization.  *See Vimeo*, 125 F.4th at 420 (service not chargeable with

17   knowledge of infringement even where service provider knew user-uploads "contained

18   copyrighted music" given that user uploads may have been authorized, licensed, or fair use).  In

19   short, Harrington cannot establish that Pinterest had disqualifying knowledge of an allegedly

20   infringing version of Harrington's photo on its service.

21       **B.    Pinterest Did Not Receive A Financial Benefit Directly Attributable To The**

22               **Allegedly Infringing Activity And Did Not Have The Right And Ability To**

23               **Control Such Activity.**

24       Harrington also cannot show either that Pinterest had "the right and ability to control" the

25   alleged infringement or "received a financial benefit directly attributable to" the alleged

26   infringement (17 U.S.C. § 512(c)(1)(B)), let alone both.  *See Motherless*, 885 F.3d at 612.  Davis

27   lost on these issues before Judge Gilliam and abandoned his arguments in the Ninth Circuit.  *Davis*,

28   601 F. Supp. 3d at 534-36; 2023 WL 5695992, at *1.  They fare no better for Harrington.

1        ***Pinterest did not have the right and ability to control the allegedly infringing activity.***

2 "[T]he right and ability to control [inquiry under the DMCA involves] 'something more than

3 merely having the general ability to locate infringing material and terminate users' access.'" *Davis*,

4 601 F. Supp. 3d at 534 (quoting *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1045 (9th

5 Cir. 2013)).  Instead, "[a] service provider must … 'exert[] ***substantial influence*** over its users'

6 activities." *Id.* (emphasis added) (quoting *Fung*, 710 F.3d at 1045); *accord Vimeo*, 125 F.4th at

7 424.  That may include "high levels of control over activities of users" or "purposeful conduct"

8 that intentionally induces infringing activity by users.  *Shelter Cap.*, 718 F.3d at 1030; *accord

9 Motherless*, 885 F.3d at 613 (affirming grant of summary judgment to service provider as to control

10 element where "uploaders, not [defendant], controlled what was uploaded" and "there was nothing

11 in the uploaded video clips to identify their infringing nature").

12        In *Davis*, Judge Gilliam found "no evidence" that Pinterest had the requisite right and

13 ability to control the infringing activity.  601 F. Supp. 3d at 534.  "Users upload content," he

14 explained, "and Pinterest does not direct them to upload any specific content." *Id.* at 535 (citing

15 DeChant Decl. I ¶¶ 2, 4).  While Pinterest determines "how it display[s]" user-uploaded content

16 and what content to recommend through "the use of algorithms," such efforts do not show control

17 over the infringing activity. *Id.* (citing *Viacom*, 940 F. Supp. 2d at 117-22).

18        Judge Gilliam's reasoning in *Davis* is equally correct when applied to Harrington's

19 notifications-based theory.  The linked-to images in Pinterest's notifications "merely link back to

20 pages on Pinterest's own website." *Id.* at 527; *see* Kramer Ex. A (K. Kim 30(b)(6) Deposition) at

21 42:3–43:24; *id.* Ex. D, Response to Interr. No. 8.  Those images are uploaded to Pinterest by users.

22 *See* DeChant Decl. I ¶¶ 2-4; Kramer Decl. Ex. B (H. Lien 30(b)(6) Deposition) at 74:20-75:2.

23 Pinterest does not direct users to upload specific content.  DeChant Decl. I ¶¶ 2-4.  And while

24 Pinterest's algorithms determine the content to recommend in notifications, Pinterest's "fully

25 automated" use of notifications to surface content of potential interest to users does not constitute

26 control. *Davis*, 601 F. Supp. 3d at 535 (no showing of control based on "Pinterest's control over

27 its algorithms or the advertising on its platform"); DeChant Decl. I ¶ 18 ("[L]ike Pinterest's feeds,

28 the notification process . . . is fully automated.").

***Pinterest did not receive a financial benefit directly attributable to the alleged infringement.***  The direct financial benefit inquiry focuses on the specific alleged infringements at issue; to demonstrate the requisite direct financial benefit, the plaintiff must show that the service provider earned revenue "distinctly attributable to the infringing material at issue." *Motherless*, 885 F.3d at 613.  As in *Davis*, Harrington cannot make that showing.

In *Davis*, the plaintiff argued that Pinterest received a financial benefit from advertising on its service, but he had no "evidence linking a specific work with any amount of money that Pinterest earned through advertising."  601 F. Supp. 3d at 535.  Nor would there be such evidence, because as Judge Gilliam found, "neither advertisers nor Pinterest can target advertisements to appear near any specific organic Pin."  *Id.*  Rather, advertisements on the Pinterest service are "tailored to the Pinterest *user*," not to particular images on the service.  *Id.*  Unable to muster any specific evidence, Davis resorted to the general theory that "by displaying [plaintiff's] works at all, Pinterest is able to drive traffic to Pinterest's website, where it derives revenue from separate advertising."  *Id.*  That generalized theory, however, cannot establish a direct financial benefit, as the Ninth Circuit has "explicitly" held.  *Id.*  (citing *Motherless*, 885 F.3d at 613 (holding that the mere placement of advertisements on a website with infringing content does not show revenue "distinctly attributable" to the infringing content)).

Harrington's claim is even weaker than Davis' on this front.  Harrington has not identified anything showing Pinterest received a financial benefit from some allegedly infringing display of his work occasioned by a notification—or from any other aspect of the notification at issue.  No such showing could be made because "[n]otifications do not contain advertisements."  DeChant Decl. I ¶ 18; Kramer Decl. Ex. A (K. Kim 30(b)(6) Deposition) at 33:5-7; *Davis*, 601 F. Supp. 3d at 520.  Similarly, it does not matter that notifications may draw users back to Pinterest's website.  Harrington cannot point to any evidence that anyone was drawn to Pinterest's website by the link to his work in the notification, much less that that yielded a direct financial benefit to Pinterest.  *See Motherless*, 885 F.3d at 613.

1

**CONCLUSION**

2       Sections 512(c) and 512(d) of the DMCA bar Harrington's lone remaining claim of direct

3   infringement.  Pinterest meets all the threshold qualifications necessary for safe-harbor protection

4   and the alleged infringement arises by reason of the storage of content on Pinterest at the direction

5   of users and by reason of Pinterest "linking users to an online location containing [allegedly]

6   infringing material."  Harrington cannot show that Pinterest had disqualifying knowledge or

7   disqualifying control coupled with direct financial benefit from the allegedly infringing display at

8   issue.  Accordingly, Pinterest is entitled to summary judgment on Harrington's claim.

9

10  Dated:  March 31, 2025                    Respectfully submitted,

11                                            WILSON SONSINI GOODRICH & ROSATI

12                                            Professional Corporation

13                                            By:  */s/ David H. Kramer*
                                                  David H. Kramer
14                                                    dkramer@wsgr.com
                                                  Thomas R. Wakefield
15                                                    twakefield@wsgr.com
                                                  Paul N. Harold
16                                                    pharold@wsgr.com
                                                  Andrew T. Kramer
17                                                    akramer@wsgr.com
                                                  Qifan Huang
18                                                    qhuang@wsgr.com

19

20                                            *Counsel for Defendant PINTEREST, INC.*

21

22

23

24

25

26

27

28