UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MAUREEN HARRINGTON, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>PINTEREST, INC.,<br><br>Defendant. | Case No.   5:20-cv-05290-EJD<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 109 |

Defendant Pinterest, Inc., ("Pinterest") moves for summary judgment in this copyright infringement suit brought by Plaintiff Maureen Harrington as a representative of Blaine Harrington III's estate (collectively, "Harrington"). Def. Pinterest, Inc.'s Notice of Mot. & Mot. for Summ. J. ("Mot."), ECF No. 109. The motion has been fully briefed. Pl.'s Mem. of P. & A. in Opp'n to Def.'s Mot. for Summ. J. ("Opp'n"), ECF No. 116; Pinterest, Inc.'s Reply in Supp. of Mot. for Summ. J. ("Reply"), ECF No. 120.

Upon careful review of the relevant documents, the Court finds this matter suitable for decision without oral argument pursuant to Local Rule 7-1(b). For the reasons discussed below, the Court **GRANTS** Pinterest's motion for summary judgment.

## I.   BACKGROUND

After a series of motions to dismiss, Harrington now brings one cause of action for direct copyright infringement on behalf of himself and a class of other professional photographers whose federally registered copyrighted works were publicly displayed by Pinterest in notifications outside of its website. 3d Am. Class Action Compl. ¶¶ 49, 59–67 ("TAC"), ECF No. 88.

Case No.: 5:20-cv-05290-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

1

### A. Pinterest's Platform

Pinterest operates one of the largest social media platforms in the world. *Id.* ¶¶ 1, 17. The aggregate monthly users of Pinterest's websites and mobile applications (collectively, its "platform") number in the hundreds of millions. *Id.* ¶¶ 1, 18. Pinterest's platform allows users to upload content in the form of a "Pin" and share that content with other Pinterest users. Decl. of Nicholas DeChant in Supp. of Def. Pinterest, Inc.'s Mot. for Summ. J., dated December 9, 2021, ¶¶ 2–3, 7 ("DeChant Decl. I"), ECF No. 109-12. A Pin operates as a "visual bookmark" and consists of the user-uploaded content (typically an image), a user-created title and description, and a hyperlink to a third-party website. *Id.* ¶¶ 2, 5, 7; Decl. of Henry Lien in Supp. of Def. Pinterest, Inc.'s Mot. for Summ. J. ¶ 5 ("Lien Decl."), ECF No. 109-11. When a user uploads content to the company's platform, Pinterest's system automatically standardizes its file format and other specifications. *Id.* ¶ 8. For images, Pinterest also generates and stores several different sizes of the uploaded content, known as "variants." *Id.* ¶¶ 9–10. Variants allow Pinterest to efficiently display uploaded content to its users across many types of devices. *Id.* ¶ 9.

Pinterest displays a custom series of user-uploaded Pins to individual users via "feeds"—grids of Pins curated by machine learning algorithms and calculated to be interesting to individual users. *Id.* ¶¶ 12–13. Pinterest further intersperses feeds on its platform with paid advertisements that visually appear similar to user-uploaded Pins and are labeled as "promoted." *Id.* ¶ 17; *see* DeChant Decl. I Exs. 1–2, 4 (screenshots of feeds on Pinterest's platform). Pinterest displays these feeds to users in many forms across its platform. DeChant Decl. I ¶¶ 12–18 (describing feeds on Pinterest's homepage, feeds displayed when viewing individual Pins, and feeds displayed as search results).

### B. Alleged Infringing Notifications

Of particular relevance here, Pinterest also displays feeds to users in notifications. TAC ¶ 24; DeChant Decl. I ¶ 18. These notifications come in several forms, including emails, in-app notifications, and mobile push notifications. TAC ¶ 24; DeChant Decl. I ¶ 18. Notifications contain hyperlinks that correspond to an image on Pinterest's platform. TAC ¶ 24; DeChant Decl.

Case No.: 5:20-cv-05290-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
2

I ¶ 18; Dep. of Kevin Kim 40:2–42:4, 44:7–12 ("Kim Dep."), ECF No. 109-2.  Typically, upon receiving a notification containing a hyperlink, user-side software—that is, the user's email program, web browser, operating system, etc.—will read the hyperlink, access the corresponding image on Pinterest's server, then display that image to the user.  Kim Dep. 42:21–43:10; Decl. of Nicholas DeChant in Supp. of Def. Pinterest, Inc.'s Mot. for Summ. J., dated March 31, 2025, ¶¶ 5–6 ("DeChant Decl. II"), ECF No. 109-20.  The parties dispute whether Pinterest's notifications also contain advertisements.  *Compare* Decl. of Michael R. Reese in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J., Ex. 15 ("Reese Decl."), ECF No. 116-16 (displaying screenshots of email notifications containing Pins with brand logos), *with* DeChant Decl. I ¶ 18 ("Notifications do not contain advertisements.").

On July 25, 2020, Pinterest sent one such email notification to Harrington that displayed an image of Harrington's own copyrighted photograph of a beach scene titled "Waikiki Beach, Honolulu, Oahu, Hawaii, USA."  TAC ¶ 31.  Harrington filed suit on July 31, 2020, approximately six days later.  Class Action Compl., ECF No. 1.

### C. The *Davis* Action

Prior to Harrington initiating the current suit, a different professional photographer filed a related action against Pinterest in the Northern District.  *See Davis v. Pinterest, Inc.*, 601 F.Supp. 3d 514, 517 (N.D. Cal. 2023) ("*Davis I*").  There, the plaintiff Davis alleged that Pinterest infringed on his copyrighted photographs by displaying them in proximity to advertisements *on the platform*.  *Id.* at 529.  Although Davis, similar to Harrington, also alleged infringement based on notifications *outside of the platform*, the District Court found that Davis failed to timely identify these instances of infringement.  *Id.* at 527.  Therefore, "instances of alleged infringement from Pinterest's notifications [were] not at issue" in the *Davis* action.[1]  *Id.*  The court ultimately found that Pinterest was entitled to safe harbor under Section 512(c) of the DMCA for works displayed on its platform.  *Id.* at 536.

---

[1] Although, in dicta, the *Davis* court suggested that works displayed in notifications would not infringe Davis's copyrights.  *Davis I*, 601 F.Supp. 3d at 527.

Case No.: 5:20-cv-05290-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
3

1    The Ninth Circuit affirmed upon appeal, holding that: (1) "[t]he district court did not abuse its discretion by refusing to consider undisclosed and untimely allegations of infringement," and (2) "Pinterest established that it is entitled to safe harbor protection" under Section 512(c). *Davis v. Pinterest, Inc.*, No. 22-15804, 2023 WL 5695992, at *1–2 (9th Cir. Sept. 5, 2023) ("*Davis II*").

### D.  Procedural History

This case was stayed pending resolution of *Davis I*, then further stayed pending Ninth Circuit's decision in *Davis II*. ECF Nos. 66, 71. When the Court lifted its stay, Harrington narrowed his infringement allegations to only notifications outside of Pinterest's platform. Mot. for Leave, ECF No. 82. Given the Ninth Circuit affirming the exclusion of allegations of infringement outside of the platform in *Davis II*, the Court found Harrington's new narrow claims were not barred under the doctrine of res judicata. Order Granting Mot. for Leave, ECF No. 87.

Pinterest subsequently filed a motion to dismiss Harrington's TAC arguing, in part, that Pinterest's conduct was protected under the DMCA safe-harbor provision per *Davis II*. Order Granting in Part & Den. in Part Mot. to Dismiss, 5, 7 ("MTD Order"), ECF. No. 100; *see* Mot. to Dismiss, ECF No. 92. The Court rejected this argument, reiterating that "the Ninth Circuit did not examine instances of infringement outside of Pinterest's platform" in *Davis II*. MTD Order at 7. The Court also found resolution of this issue inappropriate in a motion to dismiss. Given that the DMCA safe-harbor defense is a "fact intensive inquiry," *id.* (citing *Hunley v. Instagram, LLC*, 73 F.4th 1060, 1072 (9th Cir. 2023)), the Court could not decide the issue without a factual record, *id.* at 8.

Believing the factual record is now sufficiently developed, Pinterest files this motion for summary judgment asserting two DMCA safe-harbor defenses.

## II.  LEGAL STANDARD

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine dispute" exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" when it "might

Case No.: 5:20-cv-05290-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
4

1   affect the outcome of the suit under the governing law." *Id.* When ruling on a motion for

2   summary judgment, "the evidence of the nonmovant is to be believed, and all justifiable inferences

3   are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014). The Court "may not

4   make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.,*

5   *Inc.*, 503 U.S. 133, 150 (2000).

6       The moving party bears the initial burden of showing the absence of a genuine issue of

7   material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party would not

8   bear the burden of persuasion at trial, the moving party may demonstrate the absence of a genuine

9   issue by either negating or showing a lack of evidence supporting an essential element of the

10  nonmoving party's claim. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th

11  Cir. 2000). Otherwise, the moving party bears its initial burden by showing that a reasonable trier

12  of fact would find in its favor. *Celotex*, 477 U.S. at 325.

13      If the moving party successfully shows the absence of a genuine issue of material fact, the

14  burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine

15  issue for trial." *Anderson*, 477 U.S. at 256 (citing Fed. R. Civ. P. 56(e)). The nonmoving party

16  "must do more than simply show that there is some metaphysical doubt as to the material facts."

17  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Summary judgment

18  is proper if the moving party successfully establishes the absence of a genuine issue of material

19  fact and the nonmoving party fails to set forth specific facts showing a genuine issue. *Celotex*,

20  477 U.S. at 323.

21  **III.   DISCUSSION**

22      The Court finds that Pinterest's conduct is protected under the safe harbor provision in

23  Section 512(c) of the DMCA .[2]

24      Section 512(c) provides an avenue for "service provider[s]" to avoid liability for copyright

---

[2] The Court need not examine whether Pinterest also qualifies for protection under Section 512(d), or additional arguments regarding infringement, including disputes regarding the dicta in *Davis I* that "hyperlinking alone does not constitute copyright infringement" and the Ninth Circuit's "server test."

Case No.: 5:20-cv-05290-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
5

United States District Court
Northern District of California

infringement "by reason of the storage at the direction of a user of material that resides on a system or network." 17 U.S.C. § 512(c)(1). Because Section 512(c) safe harbor is an affirmative defense to copyright infringement and Pinterest would therefore have the burden of proof at trial, Pinterest has the burden here to bring undisputed evidence "establish[ing] beyond controversy every essential element" of its defense. *Mavrix Photographs, LLC v. LiveJournal, Inc.*, 873 F.3d 1045, 1052 (9th Cir. 2017) (internal quotation marks omitted); *see also Nissan Fire*, 210 F.3d at 1102.[3] To meet this burden, Pinterest must establish that it: (1) meets the threshold statutory requirements for DMCA safe harbor protections; and (2) satisfies all Section 512(c) factors. The Court will address each in turn.

### A.   Safe Harbor Threshold Requirements

To qualify for safe harbor under the DMCA, Pinterest must first satisfy several threshold statutory requirements—Pinterest must show that it is a "service provider"; that it has a formally registered designated agent; that it has a repeat infringer policy; and that it has in place standard technical measures. *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 603–04 (9th Cir. 2018). The Court finds all requirements met.

First, Pinterest is a service provider. A "service provider" is "a provider of online services or network access, or the operator of facilities therefor." 17 U.S.C. § 512(k)(1)(B). Pinterest operates one of the largest social media platforms in the world, allowing users to upload content to servers operated by Pinterest. TAC ¶ 1; DeChant Decl. I ¶ 2.

Second, it is undisputed that Pinterest has maintained a formally registered designated agent with the United States Copyright Office to "receive notifications of claimed infringement" per 17 U.S.C. § 512(c)(2). Lien Decl. ¶ 10.

Third, Pinterest implemented and communicated an adequate "repeat infringer[]" policy per 17 U.S.C. § 512(i)(1)(A). Pinterest users earn a strike when they upload content that is the subject of a valid DMCA takedown notice, and accounts that accumulate too many strikes are

---

[3] The Court further discusses the parties' respective burdens below in Part III.B.3.a.

Case No.: 5:20-cv-05290-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
6

terminated. Lein Decl. ¶¶ 16–19.

Finally, Pinterest has "accommodate[d] and d[id] not interfere with standard technical measures"[4] per 17 U.S.C. § 512(i)(1)(B). Standard technical measures enable copyright owners and service providers to establish a means of excluding infringing material without substantial expense, like a digital version the copyright symbol (©). *Ventura*, 885 F.3d at 615. Pinterest contends that there are no judicially recognized standard technical measures applicable here, and Harrington does not argue the contrary. In his TAC, Harrington does assert that he added International Press Telecommunications Council (ITPC) Metadata to his photos, a form of Copyright Management Information which includes a digitized copyright notice. TAC ¶¶ 42–44. But he fails to argue that ITPC Metadata falls within the statutory definition of "standard technical measures," and the Court has identified no binding case law addressing the issue. Even if ITPC Metadata were a "standard technical measure[]," however, Harrington also does not assert that Pinterest somehow "interfere[d]" with these measures. To the contrary, Harrington specifically alleges that Pinterest "preserves IPTC Metadata on the digital photographs that are uploaded by Pinterest users" and maintains that data on its servers. TAC ¶ 46.

### B. Section 512(c) Requirements

Having determined that Pinterest meets the threshold statutory requirements, the Court now examines whether Pinterest has met its burden to prove that its alleged conduct is protected under Section 512(c). This requires three showings: (1) the alleged infringement occurred "by reason of the storage" of copyrighted material "at the direction of a user" of its service, 17 U.S.C. §§ 512(c)(1); (2) Pinterest had no actual or red flag knowledge that the stored material is infringing, 17 U.S.C. §§ 512(c)(1)(A)(i)–(ii); and (3) Pinterest either had no "right and ability to control" the allegedly infringing activity or did not directly financially benefit from the activity, 17

---

[4] The term "standard technical measures" refers to measures "used by copyright owners to identify or protect copyrighted works" that: (A) are developed by "a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process"; (B) "are available to any person on reasonable and nondiscriminatory terms"; and (C) "do not impose substantial costs on service providers." 17 U.S.C. § 512(i)(2).

Case No.: 5:20-cv-05290-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
7

U.S.C. § 512(c)(1)(B). The Court addresses each element in turn.

### 1. By Reason of the Storage at the Direction of a User

Section 512(c) "focuses on the service provider's role in making material stored by a user publicly accessible on its site." *Mavrix*, 873 F.3d at 1053. To qualify for Section 512(c) safe harbor, a service provider must show that the alleged infringement occurred "by reason of the storage at the direction of a user of material that resides on" its system. 17 U.S.C § 512(c)(1). Congress contemplated that "storage" within the meaning of Section 512(c) includes "'providing server space for a user's web site, for a chatroom, or other forum in which material may be posted at the direction of users.'" *Mavrix*, 873 F.3d at 1052 (quoting S. Rep. 105-190, at 43 (1998)). Thus, "the phrase 'by reason of the storage at the direction of a user' covers more than 'mere electronic storage lockers.'" *Ventura*, 885 F.3d at 605–06 (quoting *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1016 (9th Cir. 2013)). "[P]ublic accessibility is the critical inquiry." *Mavrix*, 873 F.3d at 1053. Any activity that is "narrowly directed towards enhancing the accessibility of [] posts" is eligible for Section 512(c) safe harbor. *Id.* at 1056 (internal quotation omitted). The question the Court must answer, then, is whether Pinterest's allegedly infringing display of Harrington's copyrighted work in an email notification was "narrowly directed towards enhancing the accessibility" of user-uploaded content on Pinterest's platform.

No court within the Ninth Circuit has addressed this precise question. In *Davis II*, the Ninth Circuit affirmed the District Court's holding that displays *within* Pinterest's platform arise "by reason of the storage at the direction of a user." *Davis II*, 2023 WL 5695992, at *1. The Circuit reasoned that "Pinterest's algorithms and other processes for displaying content [on its platform] alter user-uploaded content to facilitate access" because they are "'narrowly directed towards enhancing the accessibility of the posts.'" *Id.* (internal quotation omitted) (quoting *Ventura*, 885 F.3d at 606). But notification-based infringement *outside* of Pinterest's platform was not at issue.

Other Ninth Circuit cases cited in *Davis II* are also instructive. In *Ventura*, for example,

Case No.: 5:20-cv-05290-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
8

the Ninth Circuit held that altering the file format of uploaded content to increase accessibility before posting and "enabling users to apply search tags to uploads" are both sufficiently "narrowly directed towards enhancing [] accessibility" to qualify as "storage at the direction of a user." 885 F.3d at 606 (internal quotation marks omitted). Similarly, in *UMG*, breaking user-uploaded videos into smaller chunks and converting them into commonly used file types fell within Section 512(c) safe harbor because they were "access-facilitating processes that automatically occur when a user uploads a video" to the defendant video service. 718 F.3d at 1016.

By contrast, in *Mavrix*, there was a genuine issue of material fact as to whether "storage" of user-uploaded material on the defendant's website was at the direction of the users as opposed to the defendant itself. *See Mavrix*, 873 F.3d at 1054 (holding that the applicability of Section 512(c) turned on whether the defendant's volunteer website moderators were its agents). There, the defendant website's moderators screened user submissions and approved only those "relevant to new and exciting celebrity gossip," amounting to a mere one third of user submissions being displayed on the website. *Id.* at 1056. Similarly, in *Atari Interactive, Inc. v. Redbubble, Inc.*, storage was not "at the direction of the user" when the defendant online marketplace "project[ed] uploaded art onto stock photos of different physical products to show the final products available for purchase" because the defendant "actively participate[d] in modifying the files uploaded by users to display the designs on [the defendant's] physical products." 515 F.Supp. 3d 1089, 1096, 1101 (N.D. Cal. 2021) *aff'd in part, appeal dismissed in part,* No. 21-17062, 2023 WL 4704891 (9th Cir. July 24, 2023).

The Court finds the case before it more similar to *UMG* and *Ventura*. When a user uploads content to Pinterest, Pinterest automatically standardizes the file format and generates variants so it can algorithmically display Pins to other users in its signature grid formation. DeChant Decl. I ¶¶ 8–10, 12–13. This is the same accessibility-enhancing format standardization and tag creation that was entitled to safe harbor in *Ventura*. 885 F.3d at 606. This is also substantially similar to the video format standardization and "chunk" creation that automatically occurred in *UMG* when a user uploaded content. *UMG*, 718 F.3d at 1012; *see also Davis I*, 601 F.Supp. 3d at 531–32

Case No.: 5:20-cv-05290-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
9

1  (finding Pinterest's processes similar to those in *UMG*).  Pinterest does not modify user-uploaded

2  content for use in e-commerce as the *Atari* defendant did.  *See Atari*, 515 F.Supp. 3d at 1114.  Nor

3  does Pinterest significantly control what user-created Pins appear on its site as the defendant in

4  *Mavrix* did.  *See Mavrix*, 873 F.3d at 1056.  Although Pinterest's machine learning algorithms do

5  choose which Pins to display to which users, DeChant Decl. I ¶¶ 12–13, the Ninth Circuit

6  specifically held that these algorithms exist for purposes of facilitating access, *Davis II*, 2023 WL

7  5695992, at *1.

8        The fact that Pinterest displayed allegedly copyrighted material outside its platform is not

9  enough to push Pinterest's storage of user-uploaded material into the unsafe waters of *Mavrix* and

10  *Atari*.  Ultimately, based on the record before it, there appears to be little difference between an

11  infringing display via web browser, which was entitled to safe harbor in *Davis*, and an infringing

12  display via email.  In both cases, Pinterest's service merely provides the user's software with a

13  hyperlink.  Kim Dep. 42:21–43:10.  The software, be it a web browser or otherwise, then requests

14  the image the hyperlink corresponds to from Pinterest's server and displays it.  *Id.*  Because both a

15  hyperlink in an email and a hyperlink on a browser link back to images on Pinterest's service,

16  there is no clear reason why the first form of display would arise "by reason of the storage at the

17  direction of a user" while the second would not.

18        Harrington's arguments to the contrary are unpersuasive.  To rebut this apparent similarity,

19  Harrington points to solitary language from *Mavrix* stating that Section 512(c) "focuses on the

20  service provider's role in making material stored by a user publicly accessible *on its site*." *Mavrix*,

21  873 F.3d at 1053 (emphasis added) (citing *UMG*, 718 F.3d at 1018).[5]  According to Harrington,

22  the simple fact that the alleged infringement did not occur on Pinterest's website means Pinterest

23  was not sufficiently "enhancing accessibility" to qualify for Section 512(c) safe harbor.  But the

---

[5] Because it contends that its email notifications merely contain hyperlinks pointing to its own servers, Pinterest argues that any display within an email notification is effectively a display "on its site."  *Id.*  But the internet is ripe with hyperlinks; hyperlinks are one of the foundations upon which the internet is built.  Recognizing any hyperlink to a service provider's platform as an extension of that platform would massively expand those platforms into a convoluted network of overlapping services, making it difficult to discern where one platform ends and another begins.

*Mavrix* court drew the proposition Harrington quotes from *UMG*, which discussed "infringing materials on service providers' sites" exclusively. *UMG*, 718 F.3d at 1018. *Mavrix* also later defined two ways that infringing material can be "stored at the direction of the user": (1) "the service provider played no role in making that infringing material accessible *on its site*," or (2) "the service provider carried out activities that were 'narrowly directed' towards enhancing the accessibility of the posts." *Mavrix*, 873 F.3d at 1056 (emphasis added) (quoting *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F.Supp. 2d 1081, 1092 (C.D. Cal. 2008)). Considering this context, it appears that the Ninth Circuit did not intend the *Mavrix* language Harrington quotes to restrict Section 512(c) safe harbor only to instances of infringing display on a service provider's website. *See id.* at 1063. Rather, this *Mavrix* language is simply a concise summary of the first of two paths to "storage." Pinterest's algorithmic display of Pins takes the second path. *Davis II*, 2023 WL 5695992, at *1.

Harrington also asserts that a genuine dispute of two material facts preclude summary judgment. First, Harrington contends that Pinterest's works contain advertisements, *see* Reese Decl. Ex. 15,[6] while Pinterest contends they do not, DeChant Decl. I ¶ 18. But this fact is immaterial. Whether Pinterest's notifications contain advertising does not bear on whether the allegedly infringing display arose "by reason of the storage at the direction of a user." 17 U.S.C. § 512(c)(1). As *Davis I* noted, "courts have not withheld safe harbor protection simply because service providers advertise on their platforms alongside user-uploaded content." 601 F.Supp. 3d at 534–35 (collecting cases). Second, Harrington claims that Pinterest's notifications display images using means other than hyperlinks, but this fact is unsupported by the evidence. Harrington cites Exhibit 8 of the Reese Declaration to support this proposition, but that exhibit does not offer proof of the content of notifications; it contains only an article discussing an algorithm for determining the optimum frequency of notifications. Pinterest, on the other hand, presents evidence to show that notifications do not contain copies of images, only hyperlinks.

---

[6] Given that this fact is immaterial, the Court need not resolve evidentiary disputes regarding this irrelevant evidence here.

Case No.: 5:20-cv-05290-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
11

Kim Dep. at 42:2–4, 44:7–12. Given Harrington's failure to rebut Pinterest's evidence with evidence of his own, the Court finds no genuine issue for trial on this point.

Finally, Harrington contends that extending Section 512(c) safe harbor protections to infringement outside of Pinterest's platform would open the door for infringement on, for example, billboards in Time Square. But Section 512(c) is a fact-intensive inquiry. Though possible, like all things, Harrington's hypothesis would require extreme facts outside the bounds of this case. The email notifications here merely provide a link to Pinterest users of material uploaded by other Pinterest users, and therefore narrowly facilitates access to users' posts by sharing them with other users. By contrast, a billboard would presumably need to copy the image from the platform and display it to the general public—including those who are not Pinterest users—without providing a direct link to the user's post. Such conduct would likely not be narrowly tailored at facilitating access to the user's post.

The Court therefore finds that Pinterest has met its burden to show that the alleged infringement occurred "by reason of the storage at the direction of a user of material that resides on" its system, and Harrington failed to respond with facts establishing a genuine issue for trial.

## 2.   Actual or Red Flag Knowledge of Infringement

Next, to gain access to Section 512(c) safe harbor, Pinterest must not "have actual knowledge that the material or an activity using the material on the system or network is infringing," 17 U.S.C. § 512(c)(1)(A)(i), and it must not be "aware of facts or circumstances from which infringing activity is apparent," 17 U.S.C. § 512(c)(1)(A)(ii). Courts often describe the term "apparent" within the meaning of Section 512(c) as "red flag" knowledge. *Ventura*, 885 F.3d at 609. Unlike the prior element, "[t]he *copyright owner* must show knowledge, actual or red flag, for the [content] that infringed its copyright and are the subject of its claim." *Id.* at 610 (emphasis added) (discussing the summary judgment burden regarding Section 512(c) safe harbor).[7]

Pinterest argues there is no evidence in the record to show the requisite knowledge, and

---

[7] The Court further discusses this distinction below in Part III.B.3.a.

Case No.: 5:20-cv-05290-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
12

1  Harrington offers no evidence or argument in response.  Indeed, the only relevant evidence here
2  suggests that Pinterest had, at the minimum, no actual knowledge because Harrington never sent
3  Pinterest a takedown notice or other prior communication identifying infringing material on the
4  Pinterest service.[8]  Pl.'s Resps. to Def.'s 1st Set of Interrogs. No. 10, ECF No. 109-14.

   Accordingly, the Court finds that Pinterest has shown the record lacks evidence sufficient
   to establish that it had the actual or red flag knowledge of the allegedly infringing display, and
   Harrington failed to respond with facts establishing a genuine issue for trial.

### 3. Control and Financial Benefit

   Finally, Section 512(c) safe harbor is foreclosed if a service provider receives "a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." 17 U.S.C. § 512(c)(1)(B).  Pinterest may therefore remain eligible for Section 512(c) safe harbor if it (1) has no "right and ability to control" the allegedly infringing display, and (2) received no "financial benefit directly attributable" to that display. *See id.*

#### a. Ultimate Burden at Trial

   Before the Court begins, the Court will briefly examine the parties' ultimate burden of proof for this final element so as to determine the correct burden for summary judgment.  Pinterest cites only a recent Second Circuit decision to argue that Harrington carries the ultimate burden to show Pinterest received a financial benefit directly attributable to the infringing activity and has the right and ability to control such activity.  Mot. 17 (citing *Capitol Recs., LLC v. Vimeo, Inc.*, 125 F.4th 409, 419 (2d Cir.), *amended on reh'g in part*, 151 F.4th 13 (2d Cir. 2025) ("[A] plaintiff must also bear the burden of persuasion in showing that the defendant was disqualified from the safe harbor because it received a financial benefit directly attributable to the infringing activity

---

[8] Pinterest must further "act[] expeditiously to remove, or disable access to," the infringing material upon obtaining actual or red flag knowledge of infringement. 17 U.S.C. § 512(c)(1)(A)(iii), (C).  Since Harrington did not submit a DMCA takedown request to Pinterest and has not otherwise suggested that Pinterest had actual or red flag knowledge of the infringement, this element is not relevant to the Court's analysis.

while having the right and ability to control such activity.")). Harrington did not dispute this representation of the parties' burdens, but upon the Court's review, it appears the Ninth Circuit has not explicitly joined the Second Circuit on this point.

In 2017, the Ninth Circuit in *Mavrix* clearly held that the service provider has the burden to prove all elements of the affirmative defense of DMCA safe harbor:

> To be eligible at the threshold for the § 512(c) safe harbor, a service provider must show that the infringing material was stored "at the direction of the user." If it meets that threshold requirement, **the service provider must then show** that (1) it lacked actual or red flag knowledge of the infringing material; and (2) it did not receive a "financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity."

*Mavrix*, 873 F.3d at 1052 (internal citations omitted) (emphasis added). Then in 2018, the Ninth Circuit in *Ventura* held that the copyright owner, not the service provider, has the burden to show that the service provider has actual or red flag knowledge of the infringing material, as briefly discussed in the section above. *Ventura*, 885 F.3d at 610 ("The *copyright owner* must show knowledge, actual or red flag, for the [content] that infringed its copyright and are the subject of its claim."). But the Circuit did not discuss the burden for the final element at issue here.

Although the Court observes that multiple cases within the Ninth Circuit appear to assume that the copyright owner carries the ultimate burden to prove this final element, the Court has not been presented with, and cannot find, any Ninth Circuit case law that has held this is the standard. In the absence of such a case, the Court must follow the explicit holding in *Mavrix*—that "*the service provider* must [] show that . . . it did not receive a 'financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity.'" *Mavrix*, 873 F.3d at 1052 (emphasis added). Therefore, because Pinterest carries the ultimate burden at trial, for purposes of summary judgment, Pinterest must present undisputed evidence showing that it did not have the right and ability to control the infringement and it did not receive a financial benefit attributable to the infringement. *Celotex*, 477 U.S. at 325.

Case No.: 5:20-cv-05290-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
14

### b. Right and Ability to Control the Infringement

Returning to the Section 512(c) elements, the "right and ability to control" infringing activity requires "something more than the ability to remove or block access to materials posted on a service provider's website." *UMG*, 718 F.3d at 1030. "[A] service provider must be able to exert 'substantial influence' on its users' activities." *Ventura*, 885 F.3d at 613 (quoting *UMG*, 718 F.3d at 1030). "Substantial influence" might include "purposeful conduct" or "high levels of control over activities of users." *UMG*, 718 F.3d at 1030; *compare id.* (upholding a finding of no "right and ability to control" despite the defendant having the ability to create filtering systems or search for and remove infringing material), *with Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1046 (9th Cir. 2013) (holding that the defendant had a "right and ability to control" where he used automatic processes to specifically seek infringing material, personally assisted users with locating infringing material, and removed fake, infected, and abusive infringing material).

Here, Pinterest has presented evidence that the linked-to images in its notifications leads to user-uploaded images on Pinterest's website, and Pinterest does not direct users to upload that content. Kramer Decl. Ex. A, at 42:3–43:24; DeChant Decl. I ¶¶ 2–4; Kramer Decl. Ex. B, at 74:20–75:2. The only facts potentially relevant to whether Pinterest has the "right and ability to control" the user-uploaded content is its algorithms and advertisements. On substantially similar facts, the court in *Davis I* found that Pinterest's control over its algorithms and advertisements did not "constitute[] the kind of control that is necessary to lose safe harbor protection" under Section 512(c). [9] 601 F.Supp. 3d at 534–35 ("Users upload content, and Pinterest does not direct them to upload any specific content."); *accord*, DeChant Decl. I ¶ 2 ("Pinterest does not direct or encourage its users to upload any particular content."). The Court finds *Davis I* persuasive on this point—the connection between Pinterest's algorithms and advertisements is insufficient to show Pinterest's "right and ability to control" the allegedly infringing display. Harrington offers no additional argument or showing of evidence to persuade the Court otherwise.

Accordingly, the Court finds that Pinterest has presented undisputed evidence to show that

---

[9] The *Davis* plaintiff abandoned this argument on appeal. *See Davis II*, 2023 WL 5695992, at *1.

1   it did not have the required right and ability to control the copyrighted work here, and Harrington
2   failed to respond with facts establishing a genuine issue for trial.

### c.     Financial Benefit Attributable to Infringing Activity

But regardless, even if Pinterest had the "right and ability to control" the allegedly infringing display, the Court finds no evidence that Pinterest received "a financial benefit directly attributable to the infringing activity." *See* 17 U.S.C § 512(c)(1)(B).

A directly attributable financial benefit requires that "some revenue [] be distinctly attributable to the infringing material at issue." *Ventura*, 885 F.3d at 613. For example, the Ninth Circuit has held that a direct "financial benefit" exists where the facts support "an inference that [the defendant's] revenue stream is predicated on the broad availability of infringing materials." *Columbia*, 710 F.3d at 1045 (finding "financial benefit" where the defendant marketed his site to advertisers using infringing material, the amount of infringing material on the defendant's website was "vast," and the defendant "actively induced infringing activity on his sites"). However, the mere fact that an allegedly infringing display generally increases platform viewership alone is not enough. *Ventura*, 885 F.3d at 613 (holding no "directly attributable" financial benefit even though "the more pornography [the defendant] had, the more users it would attract, and more views would lead to more advertising revenue").

Here, Pinterest argues that it does not obtain a financial benefit distinctly attributable to any specific user-uploaded content by presenting evidence that it does not display advertisements in its notification messages, let alone in the notification containing Harrington's work. DeChant Decl. I ¶ 18; Kramer Decl. Ex. A, at 33:5–7, 44:7–12. As discussed above, Harrington claims this fact is disputed, but the evidence Harrington presents does not support his position. Harrington cites to three exhibits to show that Pinterest displays advertisements in its notifications. Reese Decl. Ex. 3, 6, 15. Two of the exhibits are articles that do not discuss advertisements in email notifications. Reese Decl. Ex. 3, 6. The remaining exhibit claims to circle "advertisements" in images of Pinterest's email notifications; but the circled images do not appear to be advertisements. Reese Decl. Ex. 15. The evidence shows that the advertisements on Pinterest's

United States District Court
Northern District of California

platform appear similar to user-uploaded Pins, but they are labeled as "promoted." *See* DeChant Decl. I Exs. 1–2, 4 (screenshots of feeds on Pinterest's platform). Although the images Harrington circled contain brand logos, none are labeled as "promoted," and Harrington has not argued that advertisements in Pinterest's emails differ in appearance from advertisements on its platform. But regardless, even if this evidence showed advertisements appearing alongside notifications, a direct financial benefit requires facts showing revenue derived specifically from Pinterest's display of Harrington's copyrighted photo. *See Ventura*, 885 F.3d at 613. Showing that advertisements generally appear in notifications is not enough.[10] *See id.*

Ultimately, there is no evidence that Pinterest received "a financial benefit directly attributable to the infringing activity." 17 U.S.C. § 512(c)(1)(B). Certainly, no evidence suggests that Pinterest marketed itself to advertisers as containing infringing material, or that Pinterest's platform contains "vast" amounts of infringing material. *Columbia*, 710 F.3d at 1045. Further, no evidence suggests that Pinterest's business model depends on "the broad availability of infringing materials." *Id.* Although the purpose of the "entirety of Pinterest's website is to sell advertisement space," Pinterest generates no revenue "directly attributable" to particular works.[11] *Davis I*, 601 F.Supp. 3d at 535.

Accordingly, the Court also finds that Pinterest has presented sufficient evidence that it did not receive a "financial benefit directly attributable" to the display, and Harrington failed to respond with facts showing a genuine issue for trial.

IV. **CONCLUSION**

Based on the foregoing, the Court **GRANTS** Pinterest's motion for summary judgment. The Clerk of Court shall close this case.

---

[10] Indeed, though not evidence in this case, the operative complaint includes one image of Harrington's work appearing in an email notification, and it is not accompanied by an advertisement. TAC ¶ 31.

[11] Harrington does not contend that Pinterest receives revenue for displays outside its platform in a manner different from the displays within its platform.

Case No.: 5:20-cv-05290-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
17

**IT IS SO ORDERED.**

Dated: January 5, 2026

                                              EDWARD J. DAVILA
                                              United States District Judge